UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

MADISON BENTLEY ASSOCIATES, LLC,

                           Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GREGORY MESSER, as Chapter 7 Trustee,

                          Plaintiff,


             -against-                                 14-cv-2315 (LAK)

                                    (Case No. 09-15479 (SHL))
BENTLEY MANHATTAN, INC., MANHATTAN       (Adv. No. 10-03487 (SHL))
MOTORCARS, INC., and BRIAN MILLER,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**
(Corrected)

                Appearances:

                              Abner T. Zelman
                              KUCKER & BRUH, LLP

                              *Attorney for the Plaintiff*


                              Jerome Reisman
                              REISMAN PEIREZ REISMAN & CAPOBIANCO, LLP

                              *Attorney for the Defendants*


LEWIS A. KAPLAN, *District Judge.*

           Before the Court are cross-motions for summary judgment in an adversary

proceeding filed in the Bankruptcy Court.  The trustee and the defendants cross-moved for summary

judgment on the trustee's claims (1) for a declaration that defendants Bentley Manhattan and

Manhattan Motorcars are alter egos of the debtor corporation[1] and that their property therefore is

vested with the estate under Sections 541 and 542(a) of the Bankruptcy Code and (2) to recover the

full value of defendants' exercise of debtor's rights under a lease on the ground that the exercise of

those rights constituted a fraudulent conveyance.  The Bankruptcy Judge issued proposed findings

of fact and conclusions of law (the "PFC") on the motions.  The PFC proposed that the Court hold

that the trustee does not have standing to pursue a veil piercing claim against the defendants and that

the fraudulent conveyance claims are time barred.  The trustee objected and the Court considers *de*

*novo* those portions of the PFC to which objection has been made.[2]


*Background*

I.       *Facts*[3]

On March 21, 2000, defendant Brian Miller formed the debtor corporation, Madison

Bentley Associates.  He was and is Madison Bentley Associates' sole owner.  On March 29, 2000,

MMC Madison LLC ("MMC"), a non-party corporation, signed a 10-year lease for a commercial

space at 437 Madison Avenue, New York, New York with owner Madison Avenue Leasehold, LLC

("Owner") through the owner's agent, Sage Realty Corporation for a term beginning on June 15,

---

[1]      Brian Miller owns the debtor and the two defendant entities entirely or in part.

[2]      *See* FED. R. BANKR. P. 9033; *Adelphia Recovery Trust v. FLP Grp., Inc.*, 11 Civ. 6847 (PAC), 2012 WL 264180, at *7 (S.D.N.Y. Jan. 30, 2012).

[3]      The Bankruptcy Court concluded that the facts material to its determination of the motions were undisputed.  The Court adopts its findings of facts.  The following is a brief summary.

2000.  Miller signed the lease as MMC's "Managing Member" and he and his father signed personal guarantees for the first three years of the lease term.

The lease provided that the "Tenant shall use and occupy demised premises for automobile showroom for Rolls-Royce and Bentley motor cars and executive offices in connection therewith."  It provided also that MMC could assign or sublease the property with the owner's consent or to permit a "Related Entity" to use the property upon notice to the owner.  On July 18, 2000, MMC assigned the lease to the debtor with the Owner's consent,[4] and Miller and his father renewed their three-year guarantees.

The Owner then was aware that MMC and the debtor both were newly formed entities and that they had no assets other than the lease and the apparent ability to operate a Rolls Royce and Bentley showroom on the premises.  During the debtor's tenure, Bentley Manhattan – a defendant corporation owned by Miller that was not a party to the lease – wrote most of the monthly rent checks.  Bentley Manhattan had three employees who worked at the premises, selling various Bentley accessories, while Manhattan Motorcars, yet another defendant corporation owned by Miller, owned the cars that were displayed there.  On July 7, 2000, shortly before MMC assigned the lease to the debtor, the debtor and Bentley Manhattan obtained a certificate of insurance.  The certificate listed the insured as "Bentley Manhattan Inc." and "Madison Bentley Associates LLC."[5]

The debtor stopped paying rent on September 29, 2003, soon after the Millers' three-year guarantees expired, and vacated the premises.  The Owner sued the debtor, Miller, and Miller's father in New York State Supreme Court for damages for unpaid rent for the remainder of the ten-

---

[4]      Miller signed on behalf of both MMC and the debtor.

[5]      Miller Aff. [10-ap-3487 DI 26], Ex. 9.

4

year lease.  The state court dismissed the complaint as to the Millers but on June 24, 2009, awarded the Owner a $1.2 million judgment against the debtor.

Several months later, on September 11, 2009, the debtor filed a Chapter 7 bankruptcy petition, listing the Owner as its sole creditor.  The trustee subsequently initiated this adversary proceeding against Miller, Bentley Manhattan, and Manhattan Motorcars.

*Discussion*

I.      *The Trustee's Standing to Pursue a Veil Piercing Claim*

The PFC proposed holding that the trustee does not have standing to seek a declaration that Bentley Manhattan and Manhattan Motorcars are alter egos of the debtor.  It reasoned that "[t]he claim is an injury to a third party, namely the Owner, for the failure to pay rent. Indeed, it is undisputed that the Owner is the only creditor in this case.  Thus, no other party, other than the Owner, will benefit from pursuit of this alter ego claim."[6]  The trustee objected to the PFC, arguing principally that the trustee has standing because the veil piercing claim is brought pursuant to Section 542 of the Bankruptcy Code and for the benefit of the debtor's estate rather than on behalf or for the benefit of the Owner.  The defendants responded that this argument elevates form over substance.

A trustee has standing to assert a claim against a third-party if (a) it could have been asserted by the debtor pre-petition and (b) the "claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor."[7]  In other words,

---

[6]      DI 1 at 16.

[7]      *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701, 704-05 (2d Cir. 1989).

"if the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the . . . creditors, the trustee has no standing to assert it."[8]

The Court adopts the PFC's proposal that the trustee has satisfied the first prong of the test. The weight of authority in New York holds that a corporation can assert a veil piercing claim against itself.[9] To the extent that the defendants can be said to have objected, their objections are overruled. That the debtor would not have been able to bring a veil piercing claim in exactly the same form (*i.e.*, pursuant to Sections 541 and 542(a) of the Bankruptcy Code), does not mean that it could not have brought such a claim at all.

As to the second prong, the operative question is whether the trustee's veil piercing claim properly is classified as being on behalf of the debtor corporation as opposed to the sole creditor. The Court holds that the trustee has standing because the claim belongs to the estate.

For one, the trustee has brought the veil piercing claim pursuant to Sections 541 and 542(a) of the Bankruptcy Code. Those provisions enumerate what constitutes property of the estate in bankruptcy and require entities that have "possession, custody, or control . . . of property that the trustee may use, sell, or lease . . . [to] deliver to the trustee, and account for, such property or the value of such property."[10] In order to obtain any such property from the defendants, the trustee here seeks a declaration that they are alter egos of the debtor. A claim brought in this form by its very

---

[8]     *In re Granite Partnerships, L.P.*, 194 B.R. 318, 324-25 (Bankr. S.D.N.Y. 1996).

[9]     *See In Re Yerushalmi*, 487 B.R. 98, 106 (Bankr. E.D.N.Y. 2012) (collecting cases).

[10]     11 U.S.C. §§ 541, 542(a).

nature is on behalf of the debtor corporation.[11]  The nature of the claim therefore distinguishes this case from *O'Leary v. Indotronix Int'l Corp.* (*In re Chandre Corp.*),[12] upon which the PFC relies. In *O'Leary*, a creditor had an outstanding judgment against the debtor, which subsequently had transferred its assets to certain third parties.  The trustee brought an action to enforce the judgment pursuant to the N.Y. CPLR against the debtor and, on an alter ego theory, against the third parties. Such a claim on a money judgment in favor of the creditor naturally belongs to the creditor. Although it perhaps is a fine point, the veil piercing claim in this case was not brought to collect the judgment owed by the debtor to the creditor.  Instead, it was brought for a declaration as to whether property of one of the defendants in fact was property of the estate because the debtor and the creditor were alter egos.

The substance of the claim supports the Court's holding as well.  "Under New York law, a trustee may bring an alter ego cause of action on behalf of a corporate debtor in an attempt to collect property of the estate for the benefit of all creditors if such an action is not personal to any particular creditor."[13]  An action is personal to a particular creditor if the third-party defendant

---

[11]
    *See Yerushalmi*, 487 B.R. at 107 ("Part two of the St. Paul analysis of a bankruptcy trustee's standing to pursue an alter [ego] claim is also satisfied. The Trustee is asserting a generalized injury to all creditors and is seeking to recover property—which is allegedly property of the estate—for the benefit of all creditors. He bases his standing on sections 541, 542 and 704, not section 544.  His standing in this case does not derive from an injury to any one particular creditor—a fact which is now underscored by the effective reversal of the Shiboleth judgment against the Debtor.").

[12]
    03-35669 (CGM), 2005 WL 3789129 (Bankr. S.D.N.Y. Oct. 28, 2005).

[13]
    *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 92 Civ. 7754 (RPP), 1993 WL 180368, at *6 (S.D.N.Y. May 24, 1993), *aff'd* 8 F.3d 130 (2d Cir. 1993) (quoting *In re Harry C. Partridge Jr. & Sons, Inc.*, 112 B.R. 593, 596 (Bankr. S.D.N.Y. 1990)) (emphasis omitted).

    The defendants cite several cases involving the application of California, not New York, law in support of their position.

directly harmed it, as opposed to harming the debtor directly and the creditor indirectly through the debtor.[14]  Here, the issue is not which entity was harmed – it is whether the property of one of the defendants in fact is property of the bankrupt estate.  Moreover, any "harm" to the Owner was indirect – it was suffered only because the estate of the bankrupt does not include property which otherwise would have been available to satisfy the Owner's judgment.  In effect, if one properly may characterize Sections 541 and 542 as involving any question of harm, the "harm" simply is that one or more of the defendants have some property that rightly belongs to the debtor's estate.  This is a harm first to the debtor's estate and only secondarily to the creditor.

The Court notes also that the fact that there is only one creditor in this case does not automatically alter this result.[15]  Precisely the same analysis would apply in a case with hundreds of creditors as in a case with a single creditor.  In either event, the claim against the putative alter ego would be one belonging to the corporation.  Indeed, the test is whether the injury, if "injury" were the right term in an action for a declaration that property of a non-debtor, putative alter ego in fact belongs to the estate, was direct or derivative, not the number of creditors that may exist.  If Congress intended to limit the Bankruptcy Code's applicability to single-creditor bankruptcies, the

---

[14]  *See, e.g.*, *id.* at *6-*7 (citing *St. Paul*, 844 F.2d at 704).

[15]  *See, e.g.*, *Solow v. Stone*, 994 F. Supp. 173, 179 (S.D.N.Y.) (applying Delaware law, the court held "[i]f the harm is to the corporation, and therefore affects the entire corporate structure, an individual plaintiff has not suffered a particularized injury, regardless of whether he is the corporation's sole creditor."), *aff'd*, 163 F.3d 151 (2d Cir. 1998); *Bd. of Directors of Chestnut Grove Condo. Unit Owners' Ass'n v. Resolution Trust Corp.*, 161 B.R. 860, 863 (D. D.C. 1993) ("Our reasoning applies whether or not the plaintiff remains the only scheduled creditor of TB Capital.").

8

Court presumes that it would have done so expressly.  That any funds recovered here likely will be disbursed to the sole creditor through the debtor's estate does not affect the inquiry under *St. Paul*.

II.     *Fraudulent Conveyance*

The Bankruptcy Court proposed granting the defendants' motion for summary judgment on plaintiff's fraudulent conveyance claims based on its conclusions that (1) the debtor transferred its interest in the lease through a sublease or assignment when the defendant entities first started operating on the property and (2) the Owner had enough information that it should have investigated the possibility of fraud earlier than September 11, 2007.

The trustee objected.  He argued that no conveyance took place in mid-2000 when the defendant corporations began occupying the premises because the debtor did not enter into an agreement to sublease or assign the lease.  The alleged conveyance occurred when the defendants stopped performing the debtor's obligation under the lease.  The trustee reasoned that "the transfer to the Defendants of the use of the Premises leased to the Debtor was not *fraudulent* – i.e., without fair consideration and/or with actual intent to defraud – as long as the Defendants complied with the leasehold obligations of paying rent and conducting a car dealership business on the Premises."[16]

He argued also that the statute of limitations should be tolled equitably because the Owner, in consequence of misrepresentations by the debtor, did not learn until the Chapter 7 case was filed that the debtor had no legal right to operate a car dealership and that the dealership at the premises was operated by the defendant corporations.  On essentially the same basis, he contends

---

[16]     Objections [DI 2] at 15.

that the record does not support holding that the Owner knew about the fraud from as early as mid-2000.

### A.   Constructive Fraud

The Bankruptcy Court accurately set out the legal standard governing the statute of limitations for constructive fraud claims.  Under the applicable New York state law, a constructive fraud action must be brought within six years of when "the fraud or conveyance occurs."[17]  The statute of limitations is tolled upon the filing of the bankruptcy petition.  Accordingly, in order to come within the limitations period, the fraud or conveyance must have occurred within the six years preceding September 11, 2009.

The Bankruptcy Court concluded that "the conveyance occurred when the Defendants started using the Premises because that is when the Debtor allegedly conveyed the value of the property to the Defendants."  But that view ignores the nature of the apparent relationship among the parties and the nature of the transaction itself.  The property's value under the lease is alleged to have been its potential use as a showroom for Bentley and Rolls-Royce cars.  Absent an actual assignment, sublease, or some other evidence demonstrating that the debtor and the defendants understood and intended to transfer that value from the debtor to the defendants fully and completely on the date that the occupancy began, there is no basis for holding that any transfer occurred at that time as opposed to continuously during the period of occupancy.

To the contrary, the parties concede that the transfer of rights of the debtor under the lease was "continual or ongoing."  The defendants do not contend that the transfer was an

---

[17]       *Bloomfield v. Bloomfield*, 280 A.D.2d 320, 321, 721 N.Y.S.2d 15, 16 (1st Dep't 2001).

assignment or a sublease to them, let alone that it occurred pursuant to a written or even verbal agreement executed on X date and to run for any particular term or even on a month-to-month or other basis.  Rather, it is undisputed that the arrangement among the debtor and the defendants was one in which the debtor effectively transferred its right under the lease to operate a car dealership or showroom to the defendants on each and every day that the defendants so used the premises.  In effect, it was a license to use and profit from the property for which the debtor did not receive adequate consideration.  As in *Mills v. Everest Reinsurance Co.*,[18] each day that the defendants used the property that Owner leased to the debtor, to the debtor's exclusion, the assets available to the debtor were reduced.  "Therefore, each transfer constitute[d] a separate conveyance for purposes of calculating the date upon which the statute of limitations accrued."[19]

Finally, there is no question that the grant of a license to use real property constitutes a conveyance subject to fraudulent conveyance law.  "'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."[20]  This has been held to include "a release of the debtor's interest in [] realty"[21] and, by parity of reasoning, a license of its use.

---

[18]

410 F. Supp. 2d 243, 254 (S.D.N.Y. 2006).

[19]

*Id.*; *see also id.* at 255 ("Indeed, because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitations was triggered.").

[20]

N.Y. DEBT. & CRED. L. § 270 (McKinney).

[21]

*348-352 W. 27th St. Corp. v. Dropkin*, 178 Misc. 815, 818, 36 N.Y.S.2d 740, 743 (Sup. Ct. N.Y. Co. 1942).  This case arguably lends support to the trustee's contention that the fraudulent transfer occurred when the defendants caused the debtor to abandon the premises and stop making lease payments.  However, that argument was raised for the first time in the

Accordingly, the constructive fraudulent conveyance claims are not time barred to the extent that they accrued after September 11, 2003.

B.     *Actual Fraud*

A claim for actual fraud is timely only if brought within six years of the date the fraud occurred or within two years from the date on which the plaintiff discovered or with reasonable diligence could have discovered the fraud.[22]  The two-year discovery period began to run from the point at which the plaintiff "had information from which [he] reasonably could have inferred that the challenged . . . conveyance . . . was made with actual intent to hinder, delay, or defraud."[23]  Such information triggers a "duty to inquire."[24]  For the reasons discussed above, the Court holds that the six-year look back period does not bar the trustee's action for actual fraud.  As the Bankruptcy Court recognized, however, even if the fraudulent conveyance was ongoing up to September 29, 2003, the trustee likely will not be able to recover any proceeds from the defendants' use of the premises earned before September 11, 2003.  The Court accordingly goes on to evaluate

---

trustee's objections and the Court thus declines to entertain it.  *Cf. Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("a district court generally should not entertain new grounds for relief or additional legal arguments not presented to the magistrate").  This does not foreclose the Bankruptcy Court from considering this argument on remand.

[22]     *Miller v. Polow*, 14 A.D.3d 368, 787 N.Y.S.2d 319 (1st Dep't 2005); *Leone v. Sabbatino*, 235 A.D.2d 460, 461, 652 N.Y.S.2d 628, 629 (2d Dep't 1997).

[23]     *Miller*, 14 A.D.3d at 368, 787 N.Y.S.2d at 320 (citations and internal quotation marks omitted).

[24]     *Citicorp Trust Bank, FSB v. Makkas*, 67 A.D.3d 950, 953, 889 N.Y.S.2d 656, 659 (2d Dep't 2009), *abrogated on other grounds by Coyle v. Lefkowitz*, 89 A.D.3d 1054, 934 N.Y.S.2d 216 (2d Dep't 2011).

the trustee's objection to the Bankruptcy Court's proposal that the two-year notice period had run by the time the trustee initiated this action.

In determining when the two-year notice period began to run, the Court must evaluate whether the undisputed evidence shows that the trustee (standing in the shoes of the Owner) had information from which to infer that there may have been a fraud before September 11, 2007.[25]  To the extent that "it does not conclusively appear that [the Owner] had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of facts."[26]

As is noted above, the Bankruptcy Court proposed holding that the two-year discovery period began to run in mid-2000, when the defendant corporations first occupied the premises.  This is based on its proposal that the Court hold that the Owner had sufficient notice of the fraud through its knowledge that (a) the debtor was a shell corporation without assets or income; (b) entities other than the debtor were operating a business on the premises; and (c) entities other than the debtor made rent payments.

The Court agrees that the undisputed evidence conclusively shows that the Owner had ample information before September 2007 from which to infer that there may have been a fraud and that it should investigate further.  The Owner argues that while it knew that the debtor was a newly formed entity without assets at the time it received the lease assignment, it believed that the debtor had the ability to operate a car dealership or showroom and earn a profit therefrom. While that well may be true, there was ample evidence that Bentley Manhattan, Inc., not the debtor, was

---

[25]

*Miller*, 14 A.D.3d at 368, 787 N.Y.S.2d at 320.

[26]

*Trepuk v. Frank*, 44 N.Y.2d 723, 724, 405 N.Y.S.2d 452 (1978).

operating on the premises.  For example, Miller sent the Owner's agent the certificate of liability insurance, which explicitly stated that the insured were "Bentley Manhattan Inc." and "Madison Bentley Associates LLC."[27]  It was clear from the certificate that Bentley Manhattan Inc. was a legal entity distinct from Madison Bentley Associates and that it was operating on the premises.  This triggered a duty to investigate.  The facts that there were prominently displayed signs for "Bentley Manhattan" at the premises and the majority of the monthly rent checks came from "Bentley Manhattan" indicated further that a third party, and not the debtor, was operating the showroom on the premises.  As a result, the Owner had ample information from which to glean that the leaseholder – Madison Bentley Associates – had no assets or income at any time.  The contention that the Owner believed that Bentley Manhattan for Madison Bentley Associates was a doing business name, assuming the truth of that claim of subjective understanding, does not overcome the fact that the information known to the Owner – including the certificate of liability insurance, which listed Bentley Manhattan as a legal entity separate from Madison Bentley Associates – gave rise to a duty to investigate which, had it been discharged, would have revealed the actual situation.

The trustee's objections are overruled and the Court adopts the PFC's proposal that the two-year notice period applicable to claims of actual fraud began to run in or about July of 2000 and had run by the time this action was initiated.[28]

---

[27]    Miller Aff. [10-ap-3487 DI 26], Ex. 9.

[28]    The trustee is not entitled to equitable tolling for substantially the same reasons.

14

*Conclusion*

Plaintiff's motion for summary judgment is granted to the extent that the Court determines that the trustee has standing to bring the alter ego claims asserted in his first claim for relief.  In all other respects, it is remanded to the Bankruptcy Court.  Defendants' cross-motion for summary judgment dismissing the complaint is granted to the extent that the trustee's second and third claims for relief seek to recover proceeds of the defendants' exercise of debtor's right to operate a car dealership on the premises for any period preceding September 11, 2003.  It is denied in all other respects.  The case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

SO ORDERED.

Dated:        August 22, 2014
Corrected:    September 15, 2014

/s/  Lewis A. Kaplan
_____
Lewis A. Kaplan
United States District Judge